S|N|I

1  ROBERT H. NEWELL
2  robert.hardy.newell@gmail.com
   218 S. Oakland Avenue, Unit 302
3  Pasadena, CA 91101
   303-241-8783
4  Plaintiff In Pro Per

5

6

7

8              UNITED STATES DISTRICT COURT

9             CENTRAL DISTRICT OF CALIFORNIA

10

11  ROBERT H. NEWELL,                    CASE NO.: LACV20-08935-JAK-JEMx

12         Plaintiff,

13     vs.

14                                       COMPLAINT FOR DECLARATORY
                                         AND INJUNCTIVE RELIEF
15  GAVIN NEWSOM, in his official capacity
    as Governor of the State of California,
16  XAVIER BECERRA, in his official
17  capacity as Attorney General of the State
    of California, and JACKIE LACEY, in her
18  official capacity as the District Attorney of
19  Los Angeles County

20         Defendants

21

22                              

23

24

25

26

27

28

# **TABLE OF CONTENTS**

**INTRODUCTION** ..................................................................................................3

  **RELEVANT STATUTES** ..................................................................................3

  **CONSTITUTIONAL SIGNIFICANCE** ............................................................5

**PARTIES** ...............................................................................................................8

**JURISDICTION AND VENUE** ...........................................................................8

**FACTUAL ALLEGATIONS** .................................................................................9

**COUNT 1: CFC § 7822 IMPLICATES AND VIOLATES FUNDAMENTAL RIGHTS** ...............11

**COUNT 2: CFC § 7822 VIOLATES THE DOCTRINE OF PRIVITY** .................12

**COUNT 3: CFC § 7822 VIOLATES THE FOURTEENTH AMENDMENT** .........13

  **EQUAL PROTECTION: ADOPTION AND SAFE SURRENDER** .....................13

  **EQUAL PROTECTION: ABORTION** ..............................................................16

  **EQUAL PROTECTION: SPERM DONATION** .................................................22

**PRAYER FOR RELIEF** .......................................................................................23

For my complaint, I allege as follows:

## INTRODUCTION

**RELEVANT STATUTES**

1.      California Family Code (hereinafter "CFC") § 3900 stipulates that the mother and father of a minor child have an equal responsibility to support their child.

2.      California Health and Safety Code § 1255.7 and California Penal Code § 271.5 provide immunity for voluntary surrender of a newborn at designated safe-surrender sites. Parents are not liable for future support because any identifying information is kept confidential. California Health and Safety Code § 1255.7(k). In 2018, 79 babies were surrendered this way. California Department of Social Services, SSB Data, https://www.cdss.ca.gov/inforesources/ocap/safely-surrendered-baby/data. In some other states, only the mother can surrender an infant. *See, e.g.,* GA. CODE ANN. § 19-10A-4; TENN. CODE ANN. § 36-1-142.

3.      CFC § 7822 provides for the termination of parental rights and responsibilities in the case of child abandonment. To be considered abandoned, § 7822(a)(3) stipulates that one parent has left the child in the care and custody of the other parent for a period of one year without any provision for the child's support, or without communication of the parent, with the intent on the part of the parent to abandon the child. CFC § 7803 provides that such declaration of abandonment frees the child from parental custody and control and terminates all parental rights and responsibilities with regard to the child. The purpose of these provisions is to "serve the welfare and best interest of a child by providing the stability and security of an adoptive home when those conditions are otherwise missing from the child's life." CFC § 7800.

4.      CFC §§ 8604, 8605, and 8700 provide that a child can be adopted with the consent of the child's birth parents, or by a single parent. Unlike CFC § 7822, relinquishment of a child for adoption does not have a one-year waiting requirement. In fact, AdoptHelp, the top Yelp-rated adoption agency in the Los Angeles area, writes in its

FAQ: *"if you go into labor and have not yet selected a family, don't worry. Together we can create an adoption plan in a **matter of hours**."* https://www.adopthelp.com/birth-mother-question-explain-the-adoption-process-at-the-hospital/



5.    Relinquishment can be made to the California Department of Social Services, a county adoption agency, or a licensed adoption agency. CFC § 8700(a).

6.    Relinquishment terminates all parental rights and responsibilities, including the payment of child support. CFC § 8700(j). After an adoption is complete, all parental duties and responsibilities are relieved. CFC § 8617(a).

7.    Relinquishing a child for adoption is common. According to U.S. Census data, approximately two million children, or 2% of minors in the United States, live with adoptive parents. See Rose M. Kreider & Daphne A. Lofquist, *Adopted Children and Stepchildren: 2010*, Current Population Reports, P20-572, 4 (Table 1), U.S. CENSUS BUREAU (Apr. 2014), https://tinyurl.com/yc2w4vtp.

8.    Adoptions are not always permanent. According to the U.S. Department of Health and Human Services, anywhere from one percent to 5 percent of the more than 100,000 adoptions in the U.S. each year are legally terminated in what's called a "dissolution." Caitlin Moscatello, Un-Adopted: YouTubers Myka and James Stauffer

1   shared every step of their parenting journey. Except the last. The Cut, August 2020.

2   https://www.thecut.com/2020/08/youtube-myka-james-stauffer-huxley-adoption.html

3       9.      CFC § 4055 stipulates the statewide uniform guideline for determining child

4   support. When the high-earning parent does not have custody, typically at least 12% of

5   that parent's disposable income is earmarked for child support according to the

6   guidelines. Such support can be enforced by a writ of execution or a notice of levy, or an

7   earnings assignment order. CFC §§ 5100 and 5230.

8       10.     Under CFC § 7540, the child of spouses cohabiting at the time of conception

9   and birth is conclusively presumed to be a child of the marriage. Under § 7541(b), a

10  challenge to the child's parentage under § 7540 can only be undertaken within two years

11  of the child's birth.

12  **CONSTITUTIONAL SIGNIFICANCE**

13      11.     The upshot of these statutory provisions is that when both parents, or a

14  parent having sole custody, desire to relinquish or surrender a child, the child can be

15  relinquished or surrendered quickly and easily. However, when only one parent wishes to

16  abdicate parental rights and responsibilities, it is termed "abandonment." The abdicating

17  parent will likely be compelled to pay child support during the requisite one-year period,

18  and may have his or her petition for "abandonment" denied by the court if it is not in the

19  "best interest" of the child. Often, for a petition to terminate parental rights to be granted,

20  another, third party must stand ready to adopt the child – not just the custodial parent.

21  *See, e.g., Adoption of A.B.,* 2 Cal. App. 5th 912, 917 (2016). *See also In re Shannon W.,*

22  69 Cal. App. 3d 956, 962 (1977). ("*The proceedings to declare a child free from parental*

23  *control…are utilized to facilitate the adoption of the minor child."). Adoption of A.B.* also

24  demonstrates that parental rights can be terminated when child support is paid but the

25  parent is not in contact with the child, which is important to the statutory construction of

26  CFC § 7822.

27      12.     A judgment freeing a child from the custody and control of its parents results

28  in the total severance of the natural ties between the parents and the child and amounts to

the taking of "a liberty" under the due process clause of the United States Constitution. *In re Susan M.*, 53 Cal. App. 3d 300, 310 (1975). Courts have long taken the position that the right to conceive and raise one's children is an essential, basic civil right of man far more precious than property. *In re Jack H.*, 106 Cal. App. 3d 257, 263 (1980). If conceiving and raising children is a basic civil right, then so is choosing *not* to conceive or raise children. If a high constitutional bar exists for the Government to deny a parent his or her children, so a high bar must exist for the Government to foist a child on an unwilling parent. Such was the conclusion of the Supreme Court of Tennessee, to be discussed *infra. Davis v. Davis*, 842 S.W.2d 588 (1992).

13.     If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child. *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). Much like *Eisenstadt* extended the right to contraception to individuals that *Griswold* had to married couples, a parent's right to surrender parental rights and responsibilities cannot be held hostage by the co-parent.

14.     Laws like CFC § 7822 and § 8617 which distinguish between single parents and biological parents in agreement about adoption on the one hand, and biological parents in disagreement on the other, are constitutionally repugnant. A biological parent subjected to the treatment of § 7822 is denied due process of law and equal protection of the laws guaranteed by the Fourteenth Amendment. *Stanley v. Ill.*, 405 U.S. 645, 649 (1972).

15.     The right to surrender a child for adoption has not been formally recognized as a fundamental right. But state and federal courts have long recognized that adoption is an essential means "to create a legal connection between the adoptive parent and a child," "to preserve and protect the best interests of the child," "to secure for the child a permanent, stable environment," and "to achieve finality in the placement of children" 2 Am. Jur. 2d *Adoption* § 8 (Nov. 2017 update) (collecting cases). Plaintiff is unaware of

1   any case in which two parents, or a single parent, who sought to relinquish their child for

2   adoption or surrender their newborn were denied.

3        16.    Given that it has long been available in all 50 states and international

4   jurisdictions, it is reasonable to characterize the right to surrender a child to adoption as a

5   fundamental or constitutional right. Regardless of its formal categorization, however, the

6   right to surrender a child to adoption is provided for in California law and it is a violation

7   of the 14th Amendment's promise of equal protection to offer that right to biological

8   parents in agreement and single parents, but not biological parents in disagreement.

9        17.    "Yet the marital couple is not an independent entity with a mind and heart of

10  its own, but an association of two individuals each with a separate intellectual and

11  emotional makeup." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). Such was the

12  reasoning by which the *Eisenstadt* court reached the conclusion that prospective parents

13  are not a monolith, and the fundamental right to contraception belonged to each

14  individual – not the two individuals that comprise a married couple. So it must be for

15  adoption and newborn surrender as well.

16       18.    While California will pursue unwilling fathers for child support, the state

17  will also deny willing natural fathers parental rights when the conclusive presumption of

18  CFC § 7540 assigns legal parenthood to another person. *See Michael H. v. Gerald D.,*

19  491 U.S. 110, 125 (1989).  ("We have found nothing in the older sources, nor in the older

20  cases, addressing specifically the power of the natural father to assert parental rights over

21  a child born into a woman's existing marriage with another man.) If the natural progenitor

22  status of a fit parent is insufficient to grant that parent parental rights, then natural

23  parenthood should also be insufficient to foist parental responsibilities on an individual.

24       19.    Under California's statutory regime today, child support orders are enforced

25  and abandonment petitions can be denied allegedly because it serves the "best interests"

26  of a child. But in reality, two parents can agree to relinquish a child and incur no

27  continuing support obligations. A parent is therefore hostage to the whims of the co-

28  parent, not to the child itself. It is a denial of the equal protection of the laws to allow

parents in agreement to avoid child support obligations, but to impose such obligations when one parent demands it. This is especially true because the law imposes such obligations on statutory rape victims, parents who did not engage in sexual intercourse, and people who are not actually the natural parent of the child. To remedy this disparity, courts must end the one-year requirement in CFC § 7540, and liberally grant parental petitions for abandonment. The fact that a parent voluntarily files a CFC § 7822 abandonment petition should be considered strong *prima facie* evidence that the child's best interests are served by granting such a petition to recuse the unwilling parent from further parental rights and obligations.

## PARTIES

20.     Plaintiff Robert H. Newell is a resident of the Central District of California.

21.     All Defendants are sued in their official capacities only.

22.     Defendant Gavin Newsom is the Governor of the State of California. As Governor, he is vested with "the supreme executive power" of the State and "shall see that the law is faithfully executed." Cal. Const. art. 5, § 1.

23.     Defendant Xavier Becerra is the Attorney General of the State of California. He is the "chief law officer" of the State and has the duty to "see that the laws of the State are uniformly and adequately enforced." Cal. Const. art 5, § 13. Additionally, Attorney General Becerra has "direct supervision over every district attorney", in the State. *Id.* If at any point a district attorney of the State fails to enforce adequately "any law of the State," the Attorney General must "prosecute any violations of the law." *Id.* Finally, the Attorney General performs official duties within the Central District of California.

24.     Defendant Jackie Lacey is the District Attorney of Los Angeles County and performs her official duties within the Central District of California.

## JURISDICTION AND VENUE

25.     This action arises under 42 U.S.C. § 1983 and the United States Constitution. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and

1343, as well as under this Court's Original Jurisdiction, under which the Court can entertain an action to redress a deprivation of rights guaranteed by the United States Constitution. Declaratory and injunctive relief are authorized by 28 U.S.C. §§ 2201 and 2202. *See also* Fed. R. Civ. P. 65.

26.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because Plaintiff resides in this District and thus, a substantial part of the events giving rise to this claim occurred in this District.

## FACTUAL ALLEGATIONS

27.     Men can be held responsible for paternity and child support even without engaging in vaginal intercourse. In *Phillips v. Irons*, Richard Phillips was required to pay child support to Sharon Irons after she artificially inseminated herself using semen obtained from oral sex. The Associated Press, Sperm: The 'gift' that keeps on giving, NBC News, Feb. 24, 2005 (http://www.nbcnews.com/id/7024930/ns/health-sexual_health/t/sperm-gift-keeps-giving/#.XyeZBChKiUl). This was true even though under the reported facts, a court characterized Irons' conduct as follows: deceitfully engaging in sexual acts, which no reasonable person would expect to result in pregnancy, to use Phillips' sperm in an unorthodox, unanticipated manner yielding extreme consequences in the form of pregnancy. The court said that such conduct by Irons was "outrageous" and would constitute tortious conduct. *Phillips v. Irons*, 2005 Ill. App. Unpub. LEXIS 2, 10-11 (2005).

28.     For this reason, the National Basketball Association (NBA) even teaches rookie players to securely dispose of used condoms, in order to prevent stolen semen from being used for artificial insemination, child support, and financial gain by the unscrupulous. Marc Berman, Sources back Derrick Rose: NBA teaches condom disposal, The New York Post, October 12, 2016 (https://nypost.com/2016/10/12/sources-back-derrick-rose-nba-teaches-condom-disposal/).

29.    Women using sperm to impregnate themselves without a male partner's consent are probably rare. However, the issue looms large in the male imagination because the consequences are so large and borne so asymmetrically. In Kanye West's *Gold Digger*, he raps "Eighteen years, eighteen years, she got one of your kids, got you for eighteen years...and on the 18th birthday he found out it wasn't his".

30.    Men are required to pay child support even when they are victims of statutory rape. Alia Bear Rau, Statutory rape victim forced to pay child support, USA Today, September 2, 2014 (https://www.usatoday.com/story/news/nation/2014/09/02/statutory-rape-victim-child-support/14953965/).

31.    In *County of San Luis Obispo v. Nathaniel J.*, a 15-year-old statutory rape victim was declared liable for child support. *County of San Luis Obispo v. Nathaniel J.*, 57 Cal. Rptr. 2d 843, 843 (1996). The court announced its opinion by saying that, "Victims have rights. Here, the victim also has responsibilities." *Ibid*. The court opined that the victim was a "willing" participant who was not an "innocent victim" because the minor had characterized the rape as "mutually agreeable." *Id*. at 843-844.

32.    Men are required to pay child support even when they are not the natural father of a child. Under CFC §§ 7540 and 7541, parentage is "conclusively presumed" when parents are married and cohabiting; a challenge based on genetic testing can only be brought within two years of the child's birth. If such a challenge is not brought within two years, the putative father faces 16 additional years of indentured servitude under CFC § 4055.

33.    Under California law, child support payments can be foisted upon statutory rape victims and the sexually abstinent. However, child support payments can be avoided entirely if the biological co-parent also agrees to relinquish the child for adoption or to surrender a newborn. Alternatively, child support payments can be avoided if the co-parent locates a third party to co-adopt the child to facilitate the biological parent's

abandonment petition under CFC § 7822, so long as the third party serves the "best interest" of the child.

## COUNT 1: CFC § 7822 IMPLICATES AND VIOLATES FUNDAMENTAL RIGHTS

34.     Laws which implicate fundamental rights are reviewed with strict scrutiny for equal protection purposes. "Strict scrutiny of the classification which a State makes in a sterilization law is essential…When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).

35.     It is true that in *Rivera v. Minnich*, the Supreme Court wrote that, "the putative father has no legitimate right and certainly no liberty interest in avoiding financial obligations to his natural child that are validly imposed by state law." *Rivera v. Minnich*, 483 U.S. 574, 580 (1987). However, the Court was writing before any safe surrender statute had been passed – which will be discussed *infra*.

36.     The decision to bear or beget a child is a fundamental right. ("If the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child.") *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972).

37.     Intimate sexual conduct is a fundamental freedom, and the right to make certain decisions regarding sexual conduct extends beyond the marital relationship. *Lawrence v. Texas*, 539 U.S. 558, 562 & 565 (2003). "Individual decisions by married persons, concerning the intimacies of their physical relationship, even when not intended to produce offspring, are a form of 'liberty' protected by the Due Process Clause of the Fourteenth Amendment. Moreover, this protection extends to intimate choices by unmarried as well as married persons." *Id.* at 578. This is because it is a promise of the

Constitution that there is a realm of personal liberty which the government may not enter. *Planned Parenthood v. Casey*, 505 U.S. 833, 847 (1992).

38.     And yet, CFC §§ 4055 and 7822 subject individuals to onerous financial and other obligations solely as a result of engaging in this protected intimate conduct. This is constitutionally repugnant. To pass constitutional muster, CFC § 7822 must be amended as proposed in the Prayer for Relief, *infra*. As it stands now, CFC §§ 4055 and 7822 face the same issue that doomed the law in *Lawrence v. Texas*: you can engage in the conduct, but the state will punish you after the fact. The Supreme Court has said that this is constitutionally unacceptable.

## COUNT 2: CFC § 7822 VIOLATES THE DOCTRINE OF PRIVITY

39.     "The doctrine of privity means that a person cannot acquire rights or be subject to liabilities *arising under* a contract to which he is not a party."[1] G.H. Treitel, *The Law of Contract* 538 (8th ed. 1991).

40.     CFC § 7822 gives parents the right to petition for a determination of abandonment. CFC § 7800 stipulates that such declarations of abandonment are granted or denied based on what serves the "best interests" of the child. The statutory scheme implies that parent and child are in privity.

41.     But that is not really true. A parent can unilaterally surrender an infant if the co-parent also agrees to the surrender, or if a third party agrees to adopt the child (with or without the co-parent). CFC § 7800 purports to protect the best interests of the child but in reality holds one parent's right to abandon hostage to the whims of the co-parent – even though the co-parent is not in privity with the parent under the "best interests of the child" statutory regime.

42.     Rights cannot be held hostage by an intransigent co-parent, because co-parents are not in privity. Under the statutory scheme, a parent is only in privity with the

---

[1] As cited in Black's Law Dictionary.

child. Such disparate treatment of parents with like-minded vs. non-like-minded co-parents cannot be justified by any legitimate government interest.

## COUNT 3: CFC § 7822 VIOLATES THE FOURTEENTH AMENDMENT EQUAL PROTECTION: ADOPTION AND SAFE SURRENDER

43.    It is an equal protection violation for a person to have the right to surrender, or relinquish for adoption, a child only with agreement from the co-parent. CFC § 7800 stipulates that CFC § 7822, the abandonment provision, operates to serve the "best interests" of a child. But in reality, a parent is hostage only to the co-parent, because parents in agreement can surrender a newborn under California Health and Safety Code § 1255.7 or relinquish a child for adoption under CFC § 8700.

44.    It is arbitrary and capricious, and a denial of the equal protection of the laws, to deny an individual termination of parental rights and responsibilities because of a co-parent's opinion. This is particularly true when one considers that the co-parent may be the individual's statutory rapist (*County of San Luis Obispo v. Nathaniel J.*, 57 Cal. Rptr. 2d 843, 843 (1996)), the individual may have abstained from vaginal intercourse with the co-parent (*Phillips v. Irons*), and the individual may not even be the biological parent of child (CFC §§ 7540 and 7541). And yet, such an individual is hostage to 18 years of indentured servitude under CFC § 4055. "When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942).

45.    The co-parent need not necessarily even relinquish or surrender the child, nor find a third party who will co-adopt the child to facilitate the CFC § 7822 abandonment petition. The state of California permits adoption by single people, and in fact the California Department of Social Services reports that ¼ of children adopted from the public foster system are adopted by single individuals. A parent could simply relinquish rights and responsibilities to the co-parent alone. Concerns that a child would

1    become a "ward of the state" in a single parent household elide the fact that when two

2    parents surrender a newborn child, it automatically becomes a ward of the state.

3    https://www.cdss.ca.gov/adoptions



**10. May single persons adopt?**
Yes, single men and women may also adopt. In fact, approximately one-fourth of the children adopted from the public foster care system are adopted by single individuals.

7    46.    So, single parent households are suitable for children and neither the state

8    nor the co-parent is in a position to hold the parent for ransom under CFC §§ 4055 and

9    7822. It should be *prima facie* evidence that the best interests of the child are served by

10   the CFC § 7822 abandonment petition *because* the parent wishes to abdicate parental

11   rights and responsibilities.

12   47.    This complaint alleges *supra* that fundamental rights are implicated when a

13   parent voluntarily seeks termination of parental rights and responsibilities via a CFC §

14   7822 petition. As such, strict scrutiny is appropriate. Strict scrutiny means that the law is

15   "narrowly tailored" to further a "compelling" government interest. *Johnson v.*

16   *California*, 543 U.S. 499, 505 (2005).

17   48.    But even under rational basis review, the statutory scheme of CFC §§ 4055

18   and 7822 cannot stand. Under rational basis review, a law must be "rationally related to

19   legitimate government interests." *See, e.g., Washington v. Glucksberg*, 521 U.S. 702, 728

20   (1997). The support of children is a legitimate government interest, and probably even a

21   compelling one. However, there is no rational basis to release two parents in agreement,

22   or a single parent, from all future parental obligations via safe surrender laws, while

23   imposing an 18-year financial obligation on a person whose co-parent wishes to retain the

24   child. The state does not even attempt a rational basis: instead, it abdicates this distinction

25   to the whim of the co-parent. The statutory scheme of CFC §§ 4055 and 7822 cannot

26   survive even rational basis review. Remember: the parent facing this obligation may be a

27   statutory rape victim, *County of San Luis Obispo v. Nathaniel J.*, 57 Cal. Rptr. 2d 843,

28

843 (1996), may have abstained from vaginal intercourse with the co-parent (*Phillips v. Irons*), and may not even be the biological parent of child (CFC §§ 7540 and 7541).

49.     The deference normally due to a legislative judgment is not merited when a statute delegates to private, nongovernmental entities the power to veto when that power is ordinarily vested in governmental agencies. *Larkin v. Grendel's Den*, 459 U.S. 116, 122 (1982). The Supreme Court expressed a view that such a delegation to private, nongovernmental entities might *never* be constitutionally permissible. *Ibid*. It is conceivable that states might have the power to discern who can and cannot surrender their newborn, though Plaintiff does not concede the point. However, *Grendel's Den* demands that discerning such surrender treatment cannot be delegated to a private, nongovernmental entity in the form of the co-parent. A co-parent cannot be the determiner of when a parent can and cannot abandon his parental rights and responsibilities; a co-parent cannot foist parental obligations on a child's other progenitor.

50.     The co-parent need not even relinquish or surrender the child. CFC § 7822 abandonment petitions are sometimes granted when a third party steps in to adopt the child alongside the co-parent (typically a step-father or step-mother adoption). But in this case, the parent petitioning to relinquish her rights and responsibilities under CFC § 7822 is not hostage to the co-parent, but rather, to an unrelated third party. And since single people are eligible to adopt in California, the state could simply permit the remaining co-parent to have sole parental rights and responsibilities. But instead, the state will pursue parents for support under CFC § 4055 even if it is not directly requested by the co-parent.

51.     "When the law lays an unequal hand on those who have committed intrinsically the same quality of offense and sterilizes one and not the other, it has made as invidious a discrimination as if it had selected a particular race or nationality for oppressive treatment." *Skinner v. Oklahoma*, 316 U.S. 535, 541 (1942). Many people engage in intimate sexual conduct of intrinsically the same nature. Yet the state burdens only those whose co-parents will not surrender the child or find a stepparent with whom

to adopt it. Those who face child support obligations may be so burdened even if they are a statutory rape victim, did not engage in vaginal intercourse, or are not even the natural parent of the child.

52.     Plaintiff reminds the court that as recently as 1965 in Texas, a father of an out-of-wedlock child had neither the common law nor the statutory duty to support his child. *Home of Holy Infancy v. Kaska*, 397 S.W.2d 208, 210 (Tex. 1965).

53.     Beyond Equal Protection, "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children...the relationship between parent and child is constitutionally protected." *Troxel v. Granville*, 530 U.S. 57, 66 (2000). And as the Tennessee Supreme Court previously found in an embryonic context, discussion *infra*, the right to procreate is mirrored by a right to avoid procreation. So it should be that *Troxel* permits parents the right to relinquish care, custody, and control of their children.

**EQUAL PROTECTION: ABORTION**

54.     In *Rivera v. Minnich*, the Supreme Court wrote that, "the putative father has no legitimate right and certainly no liberty interest in avoiding financial obligations to his natural child that are validly imposed by state law." *Rivera v. Minnich*, 483 U.S. 574, 580 (1987).

55.     However, it is worth examining whether such obligations are validly imposed. Women can opt for contraception at the point of intercourse, or be on long-term birth control. They can also unilaterally opt for an abortion procedure. If they do so, it is their constitutional right not to notify their spouse or partner about the pregnancy or the abortion procedure. ("The spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion. It does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle.") *Planned Parenthood v. Casey*, 505 U.S. 833, 893-894 (1992).

56.     In contrast, men can utilize contraception at the point of intercourse. But if that fails, they are strictly liable for the obligations of parenthood. As established in the

discussion *supra*, these obligations will be imposed even if the male is a statutory rape victim, did not engage in vaginal intercourse, or is not the natural parent of the child.

57.    It is true that the abortion right is not perfectly analogous to abdicating rights and responsibilities with respect to a live child. In legal terms, courts have said that the abortion right is about bodily integrity, not procreative autonomy. ("The woman's right to abortion is not solely, or even primarily, based upon her right to choose not to be a mother after engaging in consensual sexual intercourse. Rather, the right to abortion, as articulated in Roe, derives from the woman's right to bodily integrity") *Dubay v. Wells*, 506 F.3d 422, 429 (2007).

58.    But as far as legal fictions go, this one is not very robust. For one thing, women can choose to have an abortion without regard to the bodily integrity interest, and solely because they do not want to become mothers. And, exercising the bodily integrity right necessarily means not becoming a mother.

59.    Constitutional scholar Jack Balkin writes that, "There are not one, but two different rights to abortion. The first right is a woman's right not to be forced by the state to bear children at risk to her life or health. The second right is a woman's right not to be forced by the state to become a mother and thus to take on the responsibilities of parenthood." Balkin, Jack M., Abortion and Original Meaning. Constitutional Commentary, Vol. 24, No. 101, 2007, Available at SSRN: https://ssrn.com/abstract=925558

60.    Balkin elaborates on this second right: "When the state bans abortion, it forces women to become mothers—with all the attendant social expectations and responsibilities—or else give up sexual intercourse (because contraception is not always effective). Because the state may not force people to become parents against their will, it may not put women to this choice." *Ibid*.

61.    Other scholars agree. In a separate publication, Balkin articulated that "women's rights to reproductive freedom are secured by the guarantees of liberty and equality in our Constitution. This reproductive freedom has two different aspects: First,

women have the right to decide whether or not to become parents and to take on the obligations and responsibilities of motherhood. Second, women have the right not to be forced by the state to sacrifice their lives or their health in order to bear children." Jack Balkin, *What* Roe v. Wade *Should Have Said*, New York University Press, 2005, pg. 45.

62.    Other pre-eminent scholars including Reva Siegel, Mark Tushnet, Anita Allen, Jed Rubenfeld, Robin West, Cass Sunstein, and Akhil Amar all "concurred" with Balkin's "judgment" upholding the abortion right. And all referenced parenthood, not just the demands of pregnancy, as important to the right to abortion. (Siegel, referencing motherhood, pg. 82; Tushnet, referencing procreation and the education and upbringing of children, pg. 86; Allen, refencing both childbearing and child-rearing, pg. 97; Rubenfeld, referencing bearing and raising children, pg. 111; West, referencing mothering children, pg. 141; Amar, referencing procreation, pg. 159). Jack Balkin, *What* Roe v. Wade *Should Have Said*, New York University Press, 2005.

63.    The idea that the abortion right is primarily one related to bodily integrity also elides the fact that *Roe* grew out of both *Griswold* and *Eisenstadt* – cases which declared access to contraception a fundamental right. While pregnancy is an onerous bodily burden, it's a further stretch to say that *Griswold* and *Eisenstadt* entail a right to disrupt the body's homeostasis with contraceptive drugs or devices. In *Eisenstadt's* own words, "if the right of privacy means anything, it is the right of the individual, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972). *Eisenstadt*, and thus *Roe*, was not purely about titrating one's own corpus with hormones or other forms of birth control – it was about the right to avoid parenthood.

64.    While the *Dubay* court's declaration that abortion is purely about bodily integrity might seem like a clever way to prevent men from avoiding the responsibilities of fatherhood, it ultimately has implications for women. Following *Planned Parenthood v. Casey*, a regulation is unconstitutional if it places an "undue burden" on a woman

seeking an abortion. An undue burden is one that has the purpose or effect of placing a "substantial obstacle" in the path of a woman seeking an abortion. *Planned Parenthood v. Casey*, 505 U.S. 833, 877 (1992).

65.     We can imagine a future in which a non-viable fetus can be extracted from a pregnant woman in much the same way as today, but can be harvested for growth in a lab. Because this procedure is identical to abortions today, except that the fetus or embryo is extracted "alive", definitionally no substantial obstacle or undue burden exists. We know this because in *Box v. Planned Parenthood*, Planned Parenthood never even argued that Indiana's law specifying the disposal of fetal remains created an undue burden on a woman's right to obtain an abortion. *Box v. Planned Parenthood of Ind. & Ky.*, Inc., 139 S. Ct. 1780, 1781 (2019). The woman is no longer pregnant, so her abortion rights have been vindicated. Of course, based on the child support regime imposed on men today, the woman will be liable for child support to the extracted embryo once it has artificially grown to term.

66.     This is not a hypothetical. Research into synthetic wombs is ongoing at Children's Hospital of Philadelphia, where sheep fetuses have been removed from their mothers' bodies after 105 to 120 days — the equivalent, in a human, of 22 to 24 weeks — and placed in "biobags," clear plastic containers filled with amniotic fluid. So far the lambs have developed with few complications. According to Dr. Alan Flake, a fetal surgeon in charge of the Philadelphia experiments, biobag technology could be available for humans in as little as one to three years. Zoltan Istvan, The Abortion Debate Is Stuck. Are Artificial Wombs the Answer? The New York Times, August 3, 2019. https://www.nytimes.com/2019/08/03/opinion/sunday/abortion-technology-debate.html

67.     A fetus is currently considered viable at 23 weeks of gestational age. Elizabeth Yuko, Weighing the Ethics of Artificial Wombs, The New York Times, May 8, 2017. https://www.nytimes.com/2017/05/08/health/artificial-wombs-ethics.html

68.     Critics will argue that such an issue is not yet ripe. But by declaring abortion only a right of bodily integrity, in order to make men strictly liable for child support after

ejaculation as in *Phillips v. Irons* and *Dubay v. Wells*, courts bind the path of future jurisprudence. If artificial wombs become viable, courts will have no choice but to permit statutes which would require artificial fetal gestation (and child support paid by the "aborting" mother).

69.     When courts have had occasion to consider the fate of embryonic tissue outside of a pregnant woman's body, the results have been schizoid. On the one hand, *Box v. Planned Parenthood* upheld an Indiana law which restricted how abortion providers dispose of fetal remains, in part by prohibiting the incineration of fetal remains along with surgical byproducts. Planned Parenthood never even argued that such a law created an undue burden on a woman's right to obtain an abortion. *Box v. Planned Parenthood of Ind. & Ky., Inc.*, 139 S. Ct. 1780, 1781 (2019). By allowing a state to determine the ultimate disposition of fetal material, this ruling would seem to presage the brave new world of lab-grown babies envisioned above.

70.     However, in *Davis v. Davis*, the Supreme Court of Tennessee reached almost the opposite conclusion. *Davis v. Davis*, 842 S.W.2d 588 (1992). In that case, a divorcing couple had previously frozen embryos. The wife wished to donate the embryos for implantation into another couple, but the husband wanted to destroy the embryos. The court cited *Eisenstadt*: "If the right of privacy means anything, it is the right of the *individual*, married or single, to be free from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id.* at 600. It was the Tennessee court that emphasized "individual."

71.     The *Davis* court characterized husband and wife as "entirely equivalent gamete-providers" and that the "party wishing to avoid procreation should prevail". *Id* at 601-602. The husband was able to destroy the embryos, even though "the State has a legitimate interest in promoting the life or potential life of the unborn." *Planned Parenthood v. Casey*, 505 U.S. 833, 870 (1992). The Supreme Court of Tennessee declared that, "the right of procreational autonomy is composed of two rights of equal significance -- the right to procreate and the right to avoid procreation." *Davis v. Davis*,

842 S.W.2d 588, 601 (1992). *Davis* appears to be the first case to recognize fundamental rights to procreate and avoid procreation. In sum, "the interest of living individuals in avoiding procreation is sufficient to justify taking steps to terminate the procreational process, despite the state's interest in potential life." *Id*. at 602.

72.     The Tennessee court felt that any prior agreement concerning disposition of the embryos should be carried out, but if no such agreement existed, the party wishing to avoid procreation should prevail. *Id*. at 604. As another judge wrote, "Once lost, the right not to procreate can never be regained. It is the irrevocability of parenthood that is most crushing to the unconsenting gamete provider; and it is principally because of this that I find it hard to imagine a situation where a court should undertake to foist parenthood upon an unwilling individual." *Kass v. Kass*, 235 A.D.2d 150, 166 (1997).

73.     Other courts have felt even more strongly that the right not to procreate is absolute. In Massachusetts, courts have said that even if both parties signed a contract giving the woman the right to the embryos in case of divorce, such a contract could not be enforced. Either parent cannot be forced to become a parent in circumstances where they object, even if they signed a contract. Pam Belluck, The Right to Be a Father (or Not), The New York Times, Nov. 6, 2005 https://www.nytimes.com/2005/11/06/weekinreview/the-right-to-be-a-father-or-not.html.

74.     So even in the face of the state's legitimate interest in potential life, a man can stop embryo implantation to avoid fatherhood. And in the state of California, California Health and Safety Code § 1255.7 and California Penal Code § 271.5 provide immunity for voluntary surrender of a newborn at designated safe-surrender sites. *Eisenstadt* tells us that procreative autonomy lies with individuals, not couples: a right granted to a couple is not easily withheld from an individual. And if some people have the right to surrender a newborn, *Grendel's Den* tells us that the government cannot delegate allocation of that right to private, nongovernmental entities: a co-parent cannot block an individual's petition to terminate parental rights and responsibilities under CFC § 7822.

75.     State governments will pursue unwilling fathers to the ends of the earth to collect child support, but a mother can surrender a child in California and her anonymity is legally protected. Agencies "routinely" try to track down biological fathers when a single mother seeks public benefits for a child. John Hanna and Heather Hollingsworth, Sperm donor case highlights child support issues, The Associated Press, January 4, 2013. https://wislawjournal.com/2013/01/04/kansas-wants-sperm-donor-pay-child-support/.

76.     And if the mother opts for an abortion instead, she has a constitutional right not to inform the father. ("The spousal notification requirement is thus likely to prevent a significant number of women from obtaining an abortion. It does not merely make abortions a little more difficult or expensive to obtain; for many women, it will impose a substantial obstacle.") *Planned Parenthood v. Casey*, 505 U.S. 833, 893-894 (1992). This unequal regime violates the 14th Amendment and cannot stand. Moreover, because privacy interests are implicated, the regime also runs afoul of the 14th Amendment's Due Process Clause.

## EQUAL PROTECTION: SPERM DONATION

77.     Courts have held that sperm donors can contract to waive their parental rights. John Hanna, Kansas judge rules sperm donor not on hook for child support, AP News, November 29, 2016. https://apnews.com/f5a0689f777f44f6ab62935e55c85156/kansas-judge-rules-sperm-donor-not-hook-child-support. This result is puzzling for three reasons. First, the fact that the mother was artificially inseminated with Marotta's sperm seems important to the court's decision, even though intimate sexual activity is a fundamental right. Therefore, a classification based on whether a child is born of voluntary artificial vs. natural insemination is highly suspect. It should not matter how the child was conceived. *Lawrence v. Texas*, 539 U.S. 558, 565 (2003). Second, if a parent can contract in advance to waive parental rights and responsibilities, perhaps parenthood should not be foisted so forcefully on people who inadvertently bear or beget offspring, such as tort or statutory rape victims. Third, the fact that the child's mother had a same-sex partner seemed

important to the court – as if Marotta would be responsible for child support if a single woman had inseminated herself. But as discussed above, single people can and do adopt children in large numbers. If Marotta is not responsible for child support, surely, the statutory rape victim is not either.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for relief against Defendants as follows:

78.   An order enjoining and restraining Defendants, and their officers, agents, servants, employees, and attorneys, and those in active concert or participation with them who receive actual notice of the injunction, from enforcing CFC § 4055 until CFC § 7822 can be brought within constitutional limits.

79.   A declaration that the one-year requirement contained in CFC § 7822(a)(3) violates the United States Constitution with respect to parents who voluntarily seek termination of their parental rights.

80.   A declaration that CFC § 7822(a)(3) can be invoked unilaterally by a parent seeking voluntary termination of his or her parental rights, and does not require consent of the other parent or adoption by a third party. A parent's voluntary petition for abandonment should be considered conclusive evidence that terminating that parent's parental rights and obligations serves the child's best interests. After all: if the parent is unfit, parental rights and responsibilities will be terminated. And if the parent is fit, "the traditional presumption [is] that a fit parent will act in the best interest of his or her child." *Troxel v. Granville*, 530 U.S. 57, 69 (2000). Therefore, the parent's voluntary petition for abandonment should be granted due to its consonance with the child's best interests. Just as California Health and Safety Code § 1255.7 and California Penal Code § 271.5 are time-limited to within 72 hours of a newborn's birth, so this right of abandonment could be time-limited to within 72 hours of birth or notification of paternity, whichever comes later.

81.     A declaration that renouncing the rights and responsibilities of parenthood can be done upon an allegation of paternity, and does not require proof that the renouncing individual is actually the biological parent.

82.     A declaration that the "abandonment" language contained in CFC § 7822 is improper and should be replaced with "relinquish" or "surrender" to mirror adoption and safe surrender statutes.

83.     A declaration that relinquishing a child for adoption is a fundamental right guaranteed by the United States Constitution. Plaintiff is aware of no case in which two parents or a single parent who attempted to relinquish a child for adoption were denied. Of course, *Eisenstadt* suggests that rights are held by individuals, not couples. And *Grendel's Den* teaches that the government cannot delegate the allocation of rights to private, non-governmental entities (in this case, a co-parent). Relinquishing a child for adoption is an individual right.

84.     A declaration that such adoptive right to relinquish parental rights and responsibilities cannot be vitiated or impaired by a biological co-parent; and

85.     Such other and further relief as the Court deems just.

Dated this 28th day of September, 2020

ROBERT H. NEWELL
Plaintiff in Pro Per